**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ZANDILE MKWANAZI** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**NATIONAL PUBLIC RADIO, INC.** )<br>)<br>**Defendant.** )<br>) | **Case No. 1:20-cv-02231** |

# EXHIBIT A
## State Court Pleadings

Filed
D.C. Superior Court
06/22/2020 11:56PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

|  |  |
|---|---|
| **ZANDILE MKWANAZI** ) | |
| **11175 Georgia Avenue, Apt. 705** ) | |
| **Wheaton, Maryland, 20902** ) | |
| ) | |
| *Plaintiff,* ) | Civil No.: **2020 CA 002861 B** |
| ) | |
| **v.** ) | |
| ) | |
| **NATIONAL PUBLIC RADIO, INC.** ) | |
| **1111 North Capitol Street N.E.** ) | |
| **Washington D.C., 20002** ) | |
| ) | |
| *Defendant.* ) | |

### COMPLAINT

Plaintiff Zandile Mkwanazi, by and through his attorney, files this Complaint against National Public Radio, Inc. (the "Defendant" or "NPR"), and for his Complaint states as follows.

1.     Plaintiff Zandile Mkwanazi seeks relief pursuant to the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401 *et seq.*, including but not limited to declaratory, injunctive and other equitable relief, compensatory and punitive damages and litigation expenses and reasonable attorneys' fees, based on Defendant's discriminatory, harassing and retaliatory actions against Plaintiff Mkwanazi.

### Jurisdiction and Venue

2.     This Court has jurisdiction over the subject matter of this Complaint pursuant to D.C. Code § 11-921.

3.     Venue is proper in this court in that the events and omissions giving rise to Plaintiff's claims occurred here in the District of Columbia and Defendant may be found here.

## Parties

4.      Zandile Mkwanazi is an African-American male born in South Africa, a citizen of the United States, a resident of the state of Maryland, and a former employee of National Public Radio, Inc.

5.      Defendant National Public Radio, Inc. is a media organization which produces and distributes news and cultural programs and receives public and private funds, and an employer within the meaning of the District of Columbia Human Rights Act, § 2-1401 *et seq.*

## Facts

6.      Plaintiff was hired by NPR as a Network Operation Center Technician, Level 1, on March 3, 2019. Plaintiff's direct supervisor was Brett Gerringer (Caucasian male).

7.      Plaintiff has extensive experience as a Network Technician and prior to working at NPR, Plaintiff worked at a television station for fourteen months and worked in a Master Control Environment for four months.

8.      On Plaintiff's first day of work, Mr. Gerringer introduced Plaintiff to his co-workers with the statement "[w]e have a new 'boy' working for us."

9.       On that same day, Plaintiff later addressed Mr. Gerringer's use of the term "boy" to refer to Plaintiff by informing Mr. Gerringer that that term was racially offensive and has a historically negative connotation. Mr. Gerringer claimed that he referred to all employees as "boys."

10.     Despite Plaintiff's statement to Mr. Gerringer that referring to him as "boy" was offensive, Mr. Gerringer continued to refer to Plaintiff with that term. During Plaintiff's mid-year review Mr. Gerringer told Plaintiff "You should be a good 'boy' because I want you to be

successful" and about one month before Plaintiff was terminated, Mr. Gerringer stated "look boy I'm trying to help you here."

***Radio Bilingue Incident***

11.     On May 11, 2019, Plaintiff was assigned to be trained by his co-worker, Jay Herrera (Latino male), as part of an assignment to familiarize Plaintiff with operations. Mr. Herrera informed Plaintiff that he should pretend that Mr. Herrera was not there, and that Plaintiff should do what he thinks should be done, and not ask Mr. Herrera any questions. Mr. Herrera then left Plaintiff's workstation to watch Fox News in the Ready Room- a break room adjacent to the Main Operations room.

12.     During Plaintiff's assignment, there was an audio outage on one of the stations, Radio Bilingue, managed by NPR. An alarm went off to indicate the audio outage. Plaintiff observed that Mr. Herrera noticed the alarm but continued to watch Fox News. Plaintiff was hesitant to ask Mr. Herrera for help since Mr. Herrera instructed Plaintiff not to bother him.

13.     Plaintiff applied what he had been told through training and the Standard Operating Procedure but unbeknownst to Plaintiff, the station had nuances Plaintiff was unfamiliar with and was still off air. The station continued to stay off air after Mr. Herrera and Plaintiff finished their shifts and was off air for a total of sixteen hours.

14.     Four days later, Mr. Gerringer called Plaintiff via phone to angrily discuss the incident. Plaintiff later inquired if he could charge for the phone call as a work hour, as stated in Plaintiff's Union contract. Mr. Gerringer replied "as opposed to writing you up" and later asked the Human Resources Department at NPR if Plaintiff would be compensated for the phone call, to which they informed him that it was compensable.

15.     In the days that followed the May 11 Radio Bilingue incident and Mr. Gerringer's call to Plaintiff, Mr. Herrera continued to behave aggressively towards the Plaintiff. When Mr. Herrera took lead of the Main Operations Control Room he would hover over Plaintiff, point, and leap up towards him to give Plaintiff instructions.  Plaintiff still had a lot to learn and wanted to contribute, so he followed Mr. Herrera's instructions. When it was Plaintiff's turn to take the lead in the Main Operations Control Room and Plaintiff asked Mr. Herrera to do a task, he would refuse.

16.     On May 31, 2019 Plaintiff emailed Mr. Gerringer and Anne Stanford(female Caucasian), Manager,  to inform them that he had issues with an employee but did not state that it was Mr. Herrera. Plaintiff also informed them that that he was considering lodging a formal complaint with the Human Resources Department if things continued and Plaintiff did not want them to be surprised if he did so. Plaintiff stated clearly in his complaint that he would not like to speak further about the issue unless it was in a formal setting.

17.     Mr. Gerringer pulled Plaintiff aside near Mr. Gerringer's desk and badgered him for answers. During this aggressive questioning session, Mr. Gerringer immediately identified that Plaintiff was speaking about Mr. Herrera and would not allow Plaintiff to conclude the conversation to return to his regular duties. The fact that Mr. Gerringer was asking for details about Plaintiff's email at Plaintiff's desk in an open setting with other people passing by and sitting around them made Plaintiff even more uneasy.

***Smoke Test Incident***

18.     On July 11, 2019, Mr. Gerringer entered the Network Operations Center("NOC") to ask Plaintiff if he would like to stay after Plaintiff's shift ended to observe the Content Depot switchover. After a discussion about Plaintiff's transportation logistics, they agreed that Plaintiff

would leave at 23:15, which was 2 hours after his shift ended. After Mr. Gerringer left, Mr. Herrera instructed Plaintiff to do the "smoke test procedure" which meant that Plaintiff would end up staying past 23:15 that evening.

19.     Mr. Herrera grabbed a print out of the "smoke test procedure" from the bulletin board and slammed it on Plaintiff's laptop keyboard to emphasize this was an instruction. Plaintiff informed Mr. Herrera that the discussion that he had with Mr. Gerringer was about observing the test and that Plaintiff would be leaving at 23:15. Their conversation went on for a couple of minutes and no matter how many times Plaintiff  informed Mr. Herrera that he was there to observe, Mr. Herrera persistently stated that Plaintiff was supposed to carry out the test. Plaintiff attempted to hand Mr. Herrera the procedure but Mr. Herrera walked away.

20.     The following day, Plaintiff informed Mr. Gerringer that Mr. Herrera was hostile towards him during the Smoke Test. Mr. Gerringer told Plaintiff he should not worry about it.

21.     A week later, on July 18, 2019, Plaintiff met with Mr. Gerringer for Plaintiff's mid-year review and they discussed  the Smoke Test Incident. Mr. Gerringer asked Plaintiff what he could have done better during the Smoke Test Incident to communicate better with Mr. Herrera. At first, Plaintiff was surprised because when he first tried to address the incident with Mr. Gerringer, Mr. Gerringer told Plaintiff to not to worry about it, that Mr. Gerringer knew that Plaintiff had to leave at 23:15, and that it was his understanding that Plaintiff would stay only until 23:15 to observe the Smoke Test. Plaintiff responded that he does not think he could have done anything better and expressed that he had done nothing wrong. However, Mr. Gerringer continued to ask Plaintiff the same question over and over and while doing so, Mr. Gerringer said "You should be 'a good boy' because I want you to be successful." Plaintiff answered the question and told Mr. Gerringer that "I guess I could have responded better to Jay's aggressions."

Unbeknownst to Plaintiff at that time Mr. Gerringer and Mr. Herrera were good friends, Mr. Herrera later told Plaintiff that he and Mr. Gerringer drove each other's cars.

22.     During Plaintiff's mid-year review Mr. Gerringer informed Plaintiff that he wanted everyone to take a communications course and asked if Plaintiff wanted to take the course. Plaintiff replied that since everyone is taking it, Plaintiff would take it as well.

23.      Plaintiff later asked his co-workers if they were taking the course and they did not know what he was talking about. Plaintiff's co-workers further informed him that they had complained about Mr. Herrera during their reviews with the managers and informed the managers that Mr. Herrera was hard to work with.

24.     Plaintiff never heard about the course from Mr. Gerringer again, and never took the course. Plaintiff did, however, learn from his coworkers that Mr. Herrera took a communications course because he had issues communicating with people at work.

*C-Band Incident*

25.     On August 7, 2019, a large storm came over NPR's building, alarms went off, and in the Main Operations Room, Mr. Herrera,  and the NOC technicians, Azin Pinder( male African-American), Kevin Smith( male Caucasian), and Dale Neiburg (male Caucasian) were present. Calls began coming in from stations that were affected, and Mr. Gerringer entered the room while Plaintiff and his co-workers were all answering calls. Plaintiff fielded four calls. During this time Mr. Gerringer asked what was going on and was briefed. Mr. Gerringer asked Mr. Smith to send out a general outage message, and he did so. Plaintiff asked if they should send out a follow-up impairment message and there was a consensus from Mr. Herrera and Mr. Smith that they should.

26.    Mr. Gerringer tasked Mr. Pinder to work on recording the times of the audio outage. Shortly after asking Mr. Pinder to work on getting the outage times, Mr. Gerringer began badgering Mr. Pinder so that he could report them to his supervisors. When Mr. Pinder got confirmation, Plaintiff walked over, took the time durations from him and went back to his workstation where Plaintiff fielded another call before beginning to draft the email.

27.    Plaintiff drafted the email which read "Please be advised this program has experienced an audio impairment. There was no audio from 16:00:20 – 16:07:53. This was due to a large storm over Washington, D.C. Please note in some areas the receiver signal may still be low."

28.    Plaintiff was later told by his managers, Mr. Gerringer and Ms. Louisa McClatcher, Director of the NOC , that Plaintiff's email incorrectly stated that there was "no audio" and the email should have stated "intermittent" audio, they also told Plaintiff that NPR had received calls for clarification, and that customers complained.

29.    Plaintiff also learned that Mr. Smith sent out an additional message during the outage where he referenced Washington State and not Washington D.C. which also caused confusion and that NPR had received phone calls for clarification, and customer complaints for his wording as well. To Plaintiff's knowledge, Mr. Gerringer had a discussion with Mr. Smith about the wording he used. Plaintiff was treated differently by Mr. Gerringer as an African-American employee because he gave Plaintiff a written warning for the wording he used. Mr. Gerringer would later refer to this incident and the Bilingue incident as his reasons to extend Plaintiff's probation as a new employee.

30.    On September 3, 2019, Plaintiff had a meeting with his managers, Mr. Gerringer and Ms. McClatcher and they gave Plaintiff a written warning for using the incorrect

terminology during the C-Band Incident and stated they would be extending Plaintiff's probation as a result of this incident.  Plaintiff asked if he should be given a verbal warning before a written one. Mr. Gerringer said that he had given Plaintiff an oral warning for the May 11 Bilingue Incident during Plaintiff's mid-year review, which was false. If Plaintiff had been disciplined in this manner, Plaintiff would have been entitled to union representation per Article 15, paragraph J of Plaintiff's Union contract.

31.     During the same meeting, Mr. Gerringer and Ms. McClatcher said there were a number of things that Plaintiff needed to work on and they handed him a list. On this list was: Plaintiff's attitude and listening skills, attention to detail, following Standard Operating Procedure, level of engagement, and lack of taking responsibility for his actions. The list had several points which confused Plaintiff, so he asked if they could give him details or examples of what they were referencing. Mr. Gerringer became irritated and referenced the Bilingue incident, C-Band Outage incident, and discrepancy report entries to explain his list. Plaintiff wrote down all of the examples and scenarios and Mr. Gerringer again became agitated saying he would have preferred Plaintiff to listen and reassure them that he would work on these issues. Plaintiff responded by stating that before this meeting none of those issues had come up in or out of any conversations or meetings ever so Plaintiff was taking note.

32.     Plaintiff observed that his Caucasian co-workers had been in similar situations and were not disciplined in this manner. During the same C-Band Incident, Mr. Smith used incorrect wording which caused customers to call in and complain about referencing Washington State instead of Washington DC.  Shawn Mcdonell (Caucasian male), a Technical Director, had also experienced outages with Radio Bilingue when he was on duty but he was never disciplined in the same manner of Plaintiff.  Mr. Mcdonell also had taken Fresh Air, a radio program, off air

when he was on duty, and action worse than Plaintiff's error, because he actually took a station off air himself. To Plaintiff's knowledge, employees may be disciplined for outages caused by employees only and not outages caused by other factors. Even Plaintiff's manager, Ms. McClatcher, has caused a worse outage when she took several stations off air. Plaintiff learned that on another separate occasion there was a station that went off because there were bugs in the system and another African-American employee, Rich Lewis, was accused of taking it off air and given a written warning.

33.     After the meeting, Plaintiff followed up with the Union expressing that he would like to file a grievance against Mr. Gerringer for falsely creating a disciplinary action against Plaintiff. Plaintiff's Shop Steward advised him to get his file from the Human Resources department to confirm if there was a notation for the verbal warning.

34.     Plaintiff was nervous about approaching the Human Resources department in fear of any retaliation. Plaintiff informed the Human Resources representative that he apparently had a verbal warning in his file and asked if he could talk about things with the representative in confidence. The Human Resources representative told Plaintiff that he could not guarantee that. The Human Resources representative was surprised when Plaintiff inquired about a verbal warning but was aware of the written warning and probation extension. The Human Resources representative agreed to get Plaintiff's file so he could look at in on another date.

35.     Later, Plaintiff conferred with some of his colleagues about asking for his file. Plaintiff concluded that by asking the Human Resources department for his file, Plaintiff's managers might learn of his intention and retaliate. The following day Plaintiff went back to the Human Resources representative and told him that he did not want to look at the file anymore because his fear of retaliation. The Human Resources representative asked for details which

Plaintiff declined to offer, again out of fear that their conversations were not confidential, and that Plaintiff's managers would retaliate against Plaintiff.

36.     Plaintiff then informed his Shop Steward that he had cancelled his request to look at his file. Plaintiff's Shop Steward expressed disappointment that Plaintiff felt intimidated. Plaintiff's Shop Steward then stated that Plaintiff should not give management the opportunity to create any information that would be in conflict with what happened and that Plaintiff should request his personnel file from the Human Resources department, which convinced Plaintiff to request his file again.

37.     A week later the Human Resources representative called Plaintiff to his office and went through Plaintiff's personnel file.  Plaintiff's file had his hiring documents and his written warning, but nothing indicated that a verbal warming was given.

38.     Even though Mr. Gerringer gave Plaintiff a written warning about his work performance, Mr. Gerringer asked Plaintiff to work additional hours on several occasions. Plaintiff worked overtime for at least twenty hours during the months of September and October, and there were multiple times where Plaintiff took the lead over the NOC at work and there were no incidents.

39.     On October 31, 2019, Plaintiff was terminated from NPR a day before his probation ended.

## COUNT I

**Violation of the District of Columbia Human Rights Act**

**D.C. Code §§ 2-1401 *et seq.***
**(Race Discrimination)**
**(Disparate Treatment and Hostile Work Environment)**

40.     Plaintiff Mkwanazi re-alleges and incorporates by reference paragraphs 1 through 39 above as if set forth fully herein.

41.     At all pertinent times, Defendant is an employer under the District of Columbia Human Rights Act. D.C. Code §§ 2-1401 et seq.

42.     At all pertinent times, Plaintiff is an employee entitled to protection under the District of Columbia Human Rights Act. D.C. Code §§ 2-1401 et seq.

43.     The D.C. Human Rights Act prohibits discrimination in employment based on an individual's race. A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with ridicule and humiliation and/or subjected to adverse action that substantially alters the work environment because of that employee's race or because the employee complained of discriminatory treatment. Specifically, Plaintiff was subjected to a hostile work environment when he was called a "boy" on multiple occasions, despite Plaintiff notifying Mr. Gerringer to discontinue use of that term; Plaintiff was also denied proper supervision and training for tasks that were assigned to him under the supervision of Mr. Herrera and Mr. Gerringer; Mr. Herrera's refusal to supervise Plaintiff during the Radio Bilingue incident; Mr. Gerringer's baseless accusation that Plaintiff was responsible for the  Radio Bilingue incident; false allegations in his performance review and termination from employment.  Plaintiff was subjected to disparate treatment when he was issued a written warning and terminated from employment when his Caucasian colleagues were not disciplined for the same or more severe offenses.

## COUNT II

**Violation of the District of Columbia Human Rights Act**
**D.C. Code §§ 2-1401 *et seq.***
**(Retaliation)**

44.     Plaintiff Mkwanazi realleges and incorporates by reference paragraphs 1 through 43 above as if set forth fully herein.

45.     At all pertinent times, Defendant is an employer under the District of Columbia Human Rights Act. D.C. Code §§ 2-1401 *et seq.*

46.     At all pertinent times, Plaintiff is an employee entitled to protection under the District of Columbia Human Rights Act. D.C. Code §§ 2-1401 *et seq.*

47.     The D.C. Human Rights Act prohibits an employer from taking action against an employee because the employee engages in protected activity and reports acts of discrimination.

48.     Defendants, in violation of the D.C. Human Rights Act, knowingly and intentionally engaged in unlawful retaliation against Plaintiff for reporting discrimination. Specifically, Plaintiff informed Mr. Gerringer that his reference to him as a "boy" was racially offensive.  Mr. Gerringer later had a hostile attitude towards Plaintiff and disciplined Plaintiff for incidents when his Caucasian colleagues committed the same or greater offenses and were not disciplined.  Mr. Gerringer also approached Plaintiff around Plaintiff's workstation and in the vicinity of Plaintiff colleagues and discussed Plaintiff's plans to file a complaint. Finally, Plaintiff was terminated by Mr. Gerringer on his final day of probation.

**Prayer for Relief**

WHEREFORE, Plaintiff Mkwanazi prays as follows:

A.     That the court issue an Order declaring Defendant's actions to be a violation of the District of Columbia Human Rights Act, D.C. Code §§ 2-1401 *et seq.*, and declaring Plaintiff eligible to receive equitable and other relief;

B.     Enter judgment against the Defendant;

C.      Issue a permanent injunction prohibiting Defendant from engaging in any discriminatory termination and retaliation;

D.      Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law, including but not limited to back pay and front pay in amounts to be determined at trial;

E.      Order Defendant to refrain from any retaliation against Plaintiff or any other person, for participating in or supporting this case in any manner;

F.      Order Defendant to pay compensatory and punitive damages in amounts to be determined at trial;

G.      Order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees and costs; and

H.      Order Defendant to pay pre-judgment and post-judgment interest as provided by law.

Date:   June 22, 2020                          Respectfully submitted,


                                               _____/s/ David A. Branch_____
                                               David A. Branch, DC Bar # 438764
                                               Law Offices of David A. Branch &
                                               Associates, PLLC
                                               1828 L Street, NW
                                               Suite 820

Washington, DC  20036
davidbranch@dbranchlaw.com
(202) 785-2805 phone
(202) 785-0289 fax

## Jury Trial Demand

Plaintiff demands a jury trial on all claims against Defendant.

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

ZANDILE MKWANAZI

_____
                                    Plaintiff

vs.                                                          Case Number   __2020 CA 002861 B__

NATIONAL PUBLIC RADIO, INC.

_____
                                    Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

David A. Branch
_____
Name of Plaintiff's Attorney

Law Offices of David A. Branch & Associates, PLLC
_____
Address

1828 L Street, NW, Suite 820, Washington, DC  20036

(202) 785-2805
_____
Telephone

Clerk of the Court

By _____
                              Deputy Clerk

Date   __06/23/2020__

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bản dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시요.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

Por: _____
Subsecretario

_____
Dirección

_____
Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화해 주십시오     የአማርኛ  ትርጉም  ለማግኘት  (202) 879-4828  ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Zandile  Mkwanazi

vs

National Public Radio , INC.

Case Number: **2020 CA 002861 B**

Date: 06/22/2020

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>  David A. Branch | Relationship to Lawsuit |
| Firm Name:<br>  Law Offices of David A. Branch & Associates, PLLC | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>  (202) 785-2805          438764 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury          ☐ 6 Person Jury          ☒ 12 Person Jury

Demand: $   To be determined at trial          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:**     *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property |    Over $25,000 Pltf. Grants Consent |    Over $25,000 Consent Denied |
| ☒ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees |    Under $25,000 Pltf. Grants Consent |    Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration<br>   Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander |    Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 19 Wrongful Eviction |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 20 Friendly Suit |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 21 Asbestos |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, | ☐ 22 Toxic/Mass Torts |
| ☐ 08 Fraud |    Not Malpractice) | ☐ 23 Tobacco |
| | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)
- [ ] 10 Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability

- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

## II.

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

## D. REAL PROPERTY

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

| | |
|---|---|
| /s/ David A. Branch | 06/22/2020 |
| Attorney's Signature | Date |



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

ZANDILE MKWANAZI
    Vs.                                     C.A. No.      2020 CA 002861 B
NATIONAL PUBLIC RADIO, INC.

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                       Chief Judge Robert E. Morin

Case Assigned to: Judge FERN FLANAGAN SADDLER
Date:  June 23, 2020
Initial Conference: 9:30 am, Friday, September 25, 2020
Location:   Courtroom 100
                 500 Indiana Avenue N.W.
                 WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch.  The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin