## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ZANDILE MKWANAZI,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL PUBLIC RADIO, INC.,<br><br>Defendant. | Civil Action No. 20-2231 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

Plaintiff Zandile Mkwanazi, an African American man, brings this employment discrimination lawsuit against his former employer, National Public Radio, Inc. ("NPR"), claiming that NPR discriminated against him and subjected him to a hostile work environment on the basis of race and retaliated against him for reporting the harassment, in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.  See* Compl. ¶¶ 40–48, ECF No. 1-2.  These claims arise from plaintiff's allegations of his direct supervisor's ongoing failure to train or supervise him, another supervisor's repeated use of a racial slur, being wrongly blamed for workplace incidents for which he was not responsible, and the eventual termination of his employment at NPR.  *See id.*  NPR moves to dismiss plaintiff's complaint for failure to state a claim under the DCHRA.  *See* Def.'s Mot. Dismiss ("Def.'s Mot."), ECF No. 6; Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mem."), ECF No. 6-2; *see also* Pl.'s Opp'n Def.'s Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 8; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), ECF No. 9.  For the reasons set forth below, NPR's motion is granted in part and denied in part.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff's claims of discrimination, hostile work environment, and retaliation rest on four separate workplace incidents that occurred during the almost eight months he was employed at NPR: his supervisor's use of a racial slur on his first day at NPR; an incident in which Radio Bilingue, an NPR station, was taken off the air for more than 16 hours; plaintiff's immediate supervisor's instruction to plaintiff to stay late to conduct a smoke test; and a misleading email plaintiff sent to NPR customers following an intermittent radio outage during a severe storm. These incidents are discussed sequentially.  NPR's argument for dismissal, on the other hand, focuses on the Collective Bargaining Agreement ("CBA") between NPR and the National Association of Broadcast Employees and Technicians ("Union").[1]

#### 1.     *Plaintiff's First Day of Employment at NPR*

NPR hired plaintiff on a probationary basis as a Network Operation Center Technician on March 3, 2019 and placed him under the direct supervision of Brett Gerringer, a Caucasian man. Compl. ¶ 6, 30.  Gerringer introduced plaintiff to his new co-workers on his first day by telling them "[w]e have a new 'boy' working for us."  *Id.* ¶ 8 (alteration in original).  Immediately following this introduction, plaintiff informed Gerringer that the term "boy" was offensive to African American people because of its historically negative connotation.  *Id.* ¶ 9.  Gerringer responded that he referred to all employees as "boys," and Gerringer continued to refer to plaintiff with this term.  *Id.* ¶¶ 9–10.  During plaintiff's mid-year review, Gerringer told plaintiff

---

[1]     At the motion to dismiss stage, consideration of "matters outside the pleadings" typically requires that the motion instead be "treated as one for summary judgment under Rule 56."  FED. R. CIV. P. 12(d).  That conversion, however, is not triggered by consideration of "documents incorporated into the complaint by reference [or] matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  As NPR points out, and plaintiff does not contest, the CBA is referenced in the complaint, *see* Def.'s Mem. at 3, and thus may be considered in resolving the pending motion for dismissal.

that he "should be a good 'boy' because [Gerringer] want[ed] [plaintiff] to be successful." *Id.*
¶ 10.  Roughly a month before plaintiff's ultimate termination in October 2019, Gerringer again
used the term, saying to plaintiff, "[L]ook boy I'm trying to help you here." *Id.*

### 2.    *The Radio Bilingue Incident*

On May 11, 2019, NPR assigned Jay Herrera, a Latino man, to train plaintiff and help
him become familiar with NPR's operations. *Id.* ¶ 11. Instead of training plaintiff, however,
Herrera largely left him to his own devices.  He told plaintiff to pretend that he was not there and
that plaintiff should not bother him with any questions. *Id.*  Herrera then retired to the
breakroom to watch TV. *Id.*  During plaintiff's shift immediately following this exchange, an
alarm activated indicating an audio outage at NPR's Radio Bilingue station. *Id.* ¶ 12.  Herrera
ignored the alarm and, because of his prior instructions, plaintiff was reluctant to ask him for
help. *Id.*  Instead, plaintiff attempted to solve the outage on his own, but his lack of experience
hampered him, and the station remained off the air for a total of sixteen hours, until after
plaintiff's and Herrera's shifts ended. *Id.*  ¶ 13.  Four days later, as a result of this incident,
Gerringer angrily called plaintiff to discuss what happened. *Id.* ¶ 14.

In the days following the Radio Bilingue incident, Herrera behaved aggressively towards
plaintiff by hovering over his work, pointing and leaping toward him when giving him
instructions, and refusing to answer his questions. *Id.* ¶ 15.  In response to Herrera's behavior,
plaintiff reached out to Gerringer and Anne Stanford, a manager who is a Caucasian woman, to
inform them that he was having issues with an unnamed employee. *Id.* ¶ 16.  He also informed
the pair that he was considering lodging a formal complaint with NPR's Human Resources
department and would not speak further on the issue unless in a formal setting. *Id.*

After this email, Gerringer brought plaintiff to Gerringer's desk and aggressively
questioned him about his complaint as other employees passed by. *Id.* ¶ 17.  Through this

questioning, Gerringer was able to determine that plaintiff's complaint referred to Herrera, and he refused to permit plaintiff to end the conversation and return to his work. *Id.*

### 3. *The Smoke Test Incident*

On July 11, 2019, Gerringer invited plaintiff to remain at work after his shift ended and observe the ContentDepot switchover. *Id.* ¶ 18.[2]  They decided that plaintiff would remain at work for two hours past the end of his shift, until 11:15 PM. *Id.*  Afterward, however, Herrera told plaintiff that he would need to remain at work past the conclusion of the switchover in order to perform the "smoke test procedure," which would cause him to stay past 11:15 PM. *Id.*[3] Herrera emphasized this direction by slamming a printout of the procedure on plaintiff's laptop and insisting that plaintiff needed to conduct the smoke test, notwithstanding plaintiff's repeated explanation that he would not be working during or after the switchover and that he would be there only to observe. *Id.* ¶ 19. The next day, plaintiff informed Gerringer about what occurred the night prior with Herrera, including that he felt Herrera was hostile toward him during the smoke test. *Id.* ¶ 20.  Gerringer responded that plaintiff should not worry about the conflict with Herrera and that he understood that plaintiff had been there only to observe and needed to leave by 11:15 PM. *Id.* ¶¶ 20, 21.

A week later, on July 18, 2019, Gerringer met with plaintiff for the latter's mid-year review. *Id.* ¶ 21.  Plaintiff's interaction with Herrera concerning and during the smoke test again came up. *Id.*  To plaintiff's surprise, and notwithstanding Gerringer's earlier statement to not worry about the interaction and that he understood that plaintiff was present at work past his shift only to observe the switchover, Gerringer asked him how he could have better handled the situation and better communicated with Herrera. *Id.*  Plaintiff replied that he could not have

---

2   The parties do not clarify the nature of this "switchover."
3   The parties do not explain exactly what this procedure is or what its purpose was.

done anything better and that he had done nothing wrong.  *Id.*  Gerringer, however, repeated the same question again and again before finally telling plaintiff that he "should be a 'good boy' because [he] want[ed] [him] to be successful."  *Id.*  Plaintiff finally answered the question by stating that he guessed he "could have responded better to Jay's aggressions."  *Id.*  Plaintiff later learned that Gerringer and Herrera were good friends.  *Id.*

In addition to this questioning, Gerringer also informed plaintiff that he should take a communications course that other employees were also taking.  *Id.* ¶ 23.  Plaintiff, under the impression that everyone was taking the course, agreed.  *Id.*  He later learned, however, that his co-workers did not know anything about the course and that only Herrera, about whom they had also complained to NPR managers, was taking the communications course, because he had issues communicating with co-workers.  *Id.* ¶¶ 23–24.  Gerringer never followed up with plaintiff about the course and plaintiff did not take the course.  *Id.* ¶ 24.

### 4.   *The C-Band Incident*

On August 7, 2019, a strong storm passed NPR's building and caused a C-Band outage, resulting in transmission issues and intermittent outages at several NPR radio stations.  *Id.* ¶¶ 25–26.  In responding to the situation, plaintiff received outage times from a co-worker and later drafted an email to NPR's customers that included the statement, "There was no audio from 16:00:20 – 16:07:53."  *Id.* ¶¶ 26–27.  Gerringer and Louisa McClatcher, Director of NPR's Network Operations Center ("NOC"), later told plaintiff that the email should have stated there was "intermittent audio" rather than "no audio," and that NPR received requests for clarifications and complaints due to the error.  *Id.* ¶ 28.

Plaintiff also received a written warning about the erroneous email from Gerringer, and this incident was later cited as a reason to extend plaintiff's period of new-employee probation. *Id.* ¶ 29.  At a September 3, 2019 meeting during which Gerringer issued plaintiff the written

warning, plaintiff asked if he should receive a verbal warning first, pursuant to the CBA's progressive-discipline policy. *See id.* ¶ 30. Gerringer replied that he had previously given plaintiff a verbal warning for the Radio Bilingue incident during their mid-year review. *Id.* ¶ 30. Plaintiff claims that Gerringer never issued him a verbal warning, and his personnel file contained no indication of a verbal warning. *Id.* ¶¶ 30, 37.

At the meeting, Gerringer and McClatcher also handed plaintiff a list of things he needed to improve. *Id.* ¶ 31. This list included areas such as his attitude, listening skills, attention to detail, ability to follow standard NPR operating procedures, level of engagement, and lack of responsibility for his actions. *Id.* When plaintiff asked examples of or details concerning several points on the list, Gerringer became irritated and referenced the Radio Bilingue incident and the C-Band outage incident. *Id.* Plaintiff wrote down the examples, which further irritated Gerringer, who stated that he would prefer for plaintiff to reassure him about working on the issues. *Id.* Plaintiff responded by stating that no one had previously brought up these issues in prior meetings or conversations, so he wanted to take notes. *Id.*

Plaintiff believed that Gerringer and McClatcher were treating him differently because he was African American. *Id.* ¶ 29. He noticed that they had not reprimanded his white co-workers in similar situations in the manner the pair reprimanded him, even when the station outages were the direct consequence of their actions or when their mistakes were responsible for taking multiple stations off the air. *Id.* ¶ 32. Additionally, plaintiff later learned that on a separate occasion, another African American employee was issued a written warning after a station went off the air due to a system glitch rather than through the employee's error. *Id.*

After the meeting, plaintiff contacted the Union, explaining that he wanted to file a grievance against Gerringer for falsely claiming that he had issued plaintiff a verbal warning

following the Radio Bilingue incident.  *See id.* ¶ 33.  Plaintiff also reached out to NPR's Human

Resources department at the suggestion of his Union shop steward to learn whether his personnel

file contained a verbal warning notation.  *Id.*  ¶¶ 33–34, 37.  Plaintiff wavered in seeking his

personnel file from Human Resources, concerned that his request for the file could result in

retaliation from Gerringer, but he ultimately retrieved the file and learned that it contained no

indication that he had been issued a verbal warning.  *Id.* ¶¶ 34–37.

> For the remainder of the summer and into the fall of 2019, plaintiff worked occasional

overtime and sometimes was the sole person in charge of NOC.  *See id.* ¶ 38.  Notwithstanding

these apparent testaments to NPR's confidence in plaintiff, his employment was terminated on

March 31, 2019, one day before his extended probationary period was due to expire.  *Id.* ¶ 39.

### 5.    *The CBA*

> NPR and the Union are parties to a CBA that controlled the terms and conditions of

plaintiff's employment.  *See* Def.'s Mem., Ex. A, CBA, ECF No. 6-3.  Under the CBA, new

employees "must complete an initial probation period of six (6) calendar months," and "NPR

shall provide a mid-probation review to advise the Employee of employment progress."  *Id.* art.

6; Def.'s Mem. at 2.  The format of the mid-probation review is either written or oral, at the

department supervisor's discretion.  CBA art. 6; Def.'s Mem at 2.  The CBA further provides

that "[e]mployees in the initial probationary period . . . may be disciplined or discharged without

cause," while regular, non-probationary employees may be disciplined or discharged only "for

cause."  CBA art. 16.  The CBA contains a grievance and arbitration procedure to resolve "any

complaint by an [e]mployee . . . as to the interpretation or application of any express provision(s)

of [the CBA]."  *Id.* art. 15(A).  The CBA further provides that "[g]reivances may be filed and

processed only through th[is] procedure."  *Id.*  The CBA also contains a provision that entitles an

employee to union representation in an instance in which he or she could receive an oral warning or other discipline. *Id.* art. 15(J).

### B.    Procedural History

Plaintiff, who resides in Maryland, Compl. ¶ 4, filed this lawsuit in D.C. Superior Court on June 22, 2020, and NPR, a D.C. corporation, *id.* ¶ 5, removed it to this Court on the basis of diversity of citizenship, on August 13, 2020. *See* Notice of Removal, ECF No. 1. Plaintiff's complaint alleges violations of the DCHRA. In Count One, he alleges that NPR discriminated against him and subjected him to a hostile work environment because of his race. Compl. ¶ 43. In support of this claim, he specifically cites Gerringer repeatedly calling him "boy" despite plaintiff informing him it was offensive; being denied proper supervision and training for his job responsibilities; Herrera's refusal to supervise him during the Radio Bilingue incident; false allegations in his July 18, 2019 mid-probation performance review; and his ultimate termination. *Id.* Plaintiff alleges that his white colleagues were not disciplined for the same or more severe offenses. *Id.* In Count Two, he alleges that NPR retaliated against him because he engaged in statutorily protected activity, namely reporting acts of discrimination and harassment. *Id.* ¶ 48. Specifically, he cites being disciplined for offenses for which white employees were not disciplined after telling Gerringer that "boy" was racially disparaging; Gerringer publicly discussing plaintiff's plans to file a complaint against Herrera; and plaintiff's ultimate termination. *Id.* The Complaint seeks back pay, compensatory and punitive damages, injunctive relief, reasonable attorney's fees and costs, and pre- and post-judgment interest. *See id.* at 12–13.

NPR seeks dismissal of both counts of plaintiff's complaint for failure to state a claim upon which relief can be granted, arguing primarily that plaintiff's DCHRA claims are

preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141 *et seq.*  *See* Def.'s Mot. at 1.  This motion is now ripe for resolution.

## II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" but instead "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see also Singletary v. Howard Univ.*, 949 F.3d 287, 295 (D.C. Cir. 2019).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construe all reasonable inferences in favor of the plaintiff.  *Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor." (citing *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014))).  The court "need not, however, 'accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint.'" *Nurriddin*, 818 F.3d at 756 (alterations in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

III.    **DISCUSSION**

NPR seeks dismissal of both counts of plaintiff's Complaint on the grounds that his claims "based on the written warning he received, the extension of his probationary period, and his ultimate termination . . . are preempted by Section 301 of the LMRA."  Def.'s Mem. at 3–4. In NPR's view, because plaintiff's claims are "substantially dependent on the CBA that governed his employment," his failure to exhaust the grievance and arbitration processes provided for by the CBA means that his complaint must be dismissed in its entirety.  *Id.* at 4.  NPR further contends that the allegations that remain once those that are preempted by § 301 have been dismissed do not suffice to state a claim for hostile work environment or retaliation under the DCHRA.  These arguments are addressed in turn, and neither is availing.

A.    **LMRA Preemption**

Section 301 of the LMRA provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185.  Section 301 "not only provides federal-court jurisdiction over controversies involving collective-bargaining agreements, but also 'authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements.'"  *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403 (1988) (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451 (1957)).  Consequently, "Section 301 completely preempts any action predicated upon state law if that action 'depends upon the meaning of a collective-bargaining agreement."  *Cephas v. MVM, Inc.*, 520 F.3d 480, 484 (D.C. Cir. 2008) (quoting *Lingle*, 486 U.S. at 405–06).

Not every dispute "tangentially involving a provision of a collective-bargaining agreement . . .  is pre-empted by § 301 or other provisions of the federal labor law," however. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985).  Thus, § 301 preempts only "state-law rights and obligations that do not exist independently of private agreements," *id.* at 213, and "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights *independent* of" the CBA.  *Caterpillar v. Williams*, 482 U.S. 386, 396 (1987) (emphasis in original).  "Thus, the crucial question a court must ask is: what is the source of the right that the plaintiff is trying to vindicate?"  *Coclough v. Akal Sec., Inc.*, 303 F. Supp. 3d 123, 133 (D.D.C. 2018) (quoting *Bratton v. Starwood Hotels & Resorts Worldwide, Inc.*, 65 F. Supp. 3d 8, 13 (D.D.C. 2014)).

NPR contends that plaintiff's complaint "depend[s] substantially on rights negotiated in collective bargaining and defined by the CBA," thereby dictating § 301 preemption, in two ways. Def.'s Mem. at 5.  First, NPR asserts that plaintiff "claims that NPR improperly extended his probationary period, . . . which allowed the company to fire him one day before he would have been subject to just cause protection under the CBA."  *Id.* (citations omitted).  Second, NPR argues that plaintiff "complains that NPR failed properly to follow the CBA's progressive discipline policy, which (he claims) had the effect of denying him union representation 'under Article 15, Paragraph J of [his] union contract.'"  *Id.* (alteration in original) (quoting Compl. ¶ 30).

Both arguments mischaracterize plaintiff's Complaint.  First, although plaintiff alludes to the fact that he "was terminated from NPR a day before his probation ended," Compl. ¶ 39, he never argues that the extension of his probationary period was improper or contrary to the terms of the CBA.  Rather, plaintiff's allegation is that he was fired for discriminatory reasons or in

Case 1:20-cv-02231-BAH   Document 12   Filed 11/13/20   Page 12 of 18

retaliation for statutorily protected activity. The passing reference to the timing of his discharge, immediately before his probationary period was due to expire, is immaterial to his claim that his termination was motivated by illegal discriminatory or retaliatory reasons.

Second, although plaintiff likewise alludes to the progressive-discipline policy of the CBA, he never alleges that the policy was violated and his claims in no way depend on such a violation occurring. Plaintiff alleges that when he was given a written warning following the C-Band incident, he asked if he should first receive an oral warning. Gerringer told him he had already received an oral warning following the Radio Bilingue incident, which, according to plaintiff, "was false." *Id.* ¶ 30. In other words, plaintiff alleges that Gerringer lied when he stated that plaintiff had been orally reprimanded following the Radio Bilingue incident. In this context, the complaint then goes on to state that "[i]f Plaintiff had been disciplined in this manner [*i.e.*, with an oral warning,] [he] would have been entitled to union representation per Article 15, paragraph J of [his] Union contract." *Id.* Although this sentence references the CBA's discipline policy, the essence of the claim is not that plaintiff was entitled to but did not receive union representation when given an oral warning, but rather that he was never given an oral warning at all and Gerringer lied in saying otherwise, to plaintiff's disadvantage. Whether he was entitled to a union representative is beside the point: the key allegation is that Gerringer lied in order to suggest that plaintiff had performed worse at his job than he actually had, disadvantaging him in comparison to his co-workers and wrongly providing justification for plaintiff's eventual termination. Further, the conditional form of the sentence belies the claim that plaintiff is alleging a violation of the discipline or union-representative policies. So understood, this paragraph of the Complaint does not allege a violation of the CBA's progressive-discipline policy and in fact does not depend at all on the CBA.

12

Thus, although plaintiff's Complaint alludes in passing to the discipline policy, union representation, and plaintiff's probationary period, all of which are governed by the CBA, plaintiff does not, contrary to NPR's insistence otherwise, "ask[] the Court to determine whether [he], as a probationary employee, was entitled to progressive discipline under . . . the CBA" or "demand[] that the Court examine the contractual circumstances under which an employee's probationary period may properly be extended," Def.'s Reply at 2. Rather, plaintiff alleges facts in support of his DCHRA claim that could also make out a claim for a violation of the CBA. The Supreme Court has acknowledged that "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle*, 486 U.S. at 409–10. For instance, although a retaliatory discharge claim "may well involve attention to the same factual considerations as the contractual determination of whether [plaintiff] was fired for just cause," such "parallelism" does not "render[] the state-law analysis dependent upon the contractual analysis." *Id.* at 408. So here, the "parallelism" between the facts plaintiff has alleged supporting his DCHRA claims and those that would support a breach of CBA claim does not transform plaintiff's DCHRA claims into preempted CBA claims. The DCHRA, not the CBA, is the "source of the right that the plaintiff is trying to vindicate." *Coclough*, 303 F. Supp. 3d at 133 (quoting *Bratton*, 65 F. Supp. 3d at 13); *see also id.* at 134 ("The plaintiff's right to be free from discrimination, harassment and retaliation does not arise from the CBA, but instead arises from a District of Columbia law—the DCHRA."); *Bratton*, 65 F. Supp. 3d at 16 ("[I]t is clear that Plaintiff's right against retaliation is not created by the CBA, but is a state-created right under the DCHRA.").

NPR relies heavily on *Berry v. Coastal International Security, Inc.*, 968 F. Supp. 2d 104 (D.D.C. 2013), to argue that "the analysis of whether NPR acted properly will inevitably require the court to conduct an analysis of the CBA and what it permitted."  Def.'s Mem. at 5–6.  To be sure, in *Berry*, an employee's DCHRA age discrimination claim was dismissed as preempted by § 301, but nonetheless this case is inapposite, since there "plaintiff specifically allege[d] that the challenged employment actions were taken in violation of rights created by the CBA."  968 F. Supp. 2d at 111.  Although "plaintiff attribute[d] his non-selection for the shift supervisor position and his treatment at the hands of his supervisors to his age, . . . the gravamen of his complaint [was] that he did not receive promotions for which he was more qualified by virtue of his seniority, and that he was not accorded the disciplinary procedure that was 'agreed upon'" pursuant to the CBA.  *Id.* at 113.  In other words, because the adverse actions that plaintiff alleged in support of his age discrimination complaint were violations of the CBA, the age discrimination complaint essentially turned on whether the CBA had been violated.[4]

Here, in contrast, as explained, plaintiff alleges no violation of the CBA and his claims of discrimination and retaliation do not depend on a violation of the CBA having occurred.  In that respect, the instant case resembles others where a plaintiff's DCHRA claims have been found not to trigger § 301 preemption merely because those claims allude to or operate against the backdrop of a CBA.  *See, e.g., Daniels v. Potomac Elec. Power Co.*, 789 F. Supp. 2d 161, 164– 65 (D.D.C. 2011) (rejecting defendant's argument "that since the aspects of plaintiff's employment that plaintiff addresses in this lawsuit are aspects covered by the CBA, federal law

---

[4]     Further, although plaintiff's DCHRA age discrimination claim was dismissed as preempted by § 301, his retaliation claim was not.  *Id.* at 113–14.  Plaintiff's retaliation claim referenced the CBA, since he alleged "that he was retaliated against for exercising appeal rights accorded to him under the CBA."  *Id.* at 114.  The claim was nevertheless independent of the CBA and thus not preempted, since "whether plaintiff engaged in a protected activity when he filed his appeal, whether [his] suspension was an adverse action, [and] whether there was a causal connection between . . . his appeal of his recommended dismissal and his indefinite suspension w[ould] not require substantial analysis of the CBA."  *Id.* (citing *Lingle*, 486 U.S. at 407).

preempts the action" and noting that "the mere fact that the parties may . . . 'reference' the CBA does not mean that the . . . court will be asked to interpret or enforce it"); *Bratton*, 65 F. Supp. 3d at 16–19.

**B.    Timeliness**

NPR also argues that plaintiff's allegations relating to the May 2019 Radio Bilingue incident are time-barred, Def.'s Mem. at 7, and plaintiff does not dispute this argument.  A DCHRA employment-discrimination plaintiff must file a claim "within one year of the unlawful discriminatory act."  D.C. Code § 2-1403.16(a).  As NPR explains, because the Radio Bilingue incident, including the arguably retaliatory encounter in which Gerringer publicly questioned plaintiff about his intention to file a human resources complaint against Herrera, had concluded by May 31, 2010, *see* Compl. ¶ 16, and plaintiff did not file the instant lawsuit until June 22, 2020, plaintiff's retaliation claim in Count Two based on the Radio Bilingue incident is barred by the statute of limitations and must be dismissed.[5]

**C.    Failure to State a Claim Under the DCHRA**

Finally, NPR cursorily contends that both counts of plaintiff's Complaint must be dismissed because they "fail to describe any adverse employment action or hostile work environment."  Def.'s Mem. at 8.  NPR's argument that plaintiff has not alleged any adverse employment action is incorrect, as he has alleged that his termination was motivated by discrimination (in Count One) and in retaliation for statutorily protected activity (in Count Two),

---

[5]    NPR rightly does not object that plaintiff's allegations that Gerringer called and referred to him as "boy" on multiple occasions before June 22, 2019 are time-barred, as plaintiff alleges that Gerringer used this epithet as recently as September 2019, *see* Compl. ¶ 10, roughly a month before his termination and roughly nine months before he filed the instant lawsuit in June 2020.  Under the DCHRA, "if 'an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability.'"  *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 890 (D.C. 2003) (en banc) (alteration in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).  Plaintiff's allegations about Gerringer's use of this term predating June 22, 2019 are therefore properly considered as part of plaintiff's hostile work environment claim.

*see* Compl. ¶¶ 43, 48, and "discharge" on the basis of race is one of the employer acts expressly prohibited by the DCHRA, *see* D.C. Code § 2-1402.11(a)(1)(A).

NPR also suggests that plaintiff has failed to identify harassment pervasive or severe enough "to affect a term, condition, or privilege of employment" and thereby constitute a hostile work environment.  Def.'s Mem. at 8 (quoting *Bilal-Edwards v. United Planning Org.*, 896 F. Supp. 2d 88, 98 (D.D.C. 2012)).  "To make out a claim under the DCHRA for creating a hostile work environment, a plaintiff must prove '(1) that [she] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.'"  *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245 (D.C. 2009) (alterations in original) (quoting *Lively*, 830 A.2d at 888).  "A work environment is actionably hostile 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . .'"  *Id.* (quoting *Lively*, 830 A.2d at 889).

Specifically, NPR argues that the improper supervision plaintiff alleges and Gerringer's request that plaintiff, but not other employees, enroll in a communications course, do not suffice to show that plaintiff was subjected to a hostile work environment.  NPR may be correct that either or even both of these allegations, standing alone, would not meet the minimal threshold showing that plaintiff was subjected to a hostile work environment.  Plaintiff's further allegations, however, about Gerringer's use of the word "boy" to his face and in introducing him to other employees, changes the picture.  *See Morgan*, 536 U.S. at 115 (observing that hostile work environment claims "are based on the cumulative effect of individual acts" that "may not

16

be actionable on [their] own"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

NPR's suggestion that Gerringer's repeated use of the word "boy" word amounts to no more than "name-calling," Def.'s Mem. at 8, is off base.  To the contrary, the word when used to refer to an African American man is an offensive, racist slur with its origins in the white supremacy of slavery and Jim Crow.  *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that a supervisor's use of the word "boy" to refer to an African American man can be evidence of racial animus); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579–81 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (explaining that even a single use of a highly offensive racial slur can create a hostile work environment).  Gerringer's behavior thus falls well outside the ambit of the "genuinely trivial occurrences," *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1173 (D.C. 2008) (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998)), "immaterial 'slights,'" *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011)), and "occasional name-calling," *id.*, that do not constitute a hostile work environment.  Nor can Gerringer plead ignorance, as plaintiff told him that the word "boy" was racially offensive the first time Gerringer used it.  Gerringer's ongoing use of this word both to address plaintiff directly and to refer to him when talking with third parties, especially combined with his close relationship with Herrera and Herrera's ongoing refusal to train or supervise plaintiff, is more than adequate to state a claim that plaintiff was subjected to harassment "sufficiently severe or pervasive to alter the conditions of [his] employment," *Barrett*, 979 A.2d at 1245 (quoting *Lively*, 830 A.2d at 889).

17

**IV.      CONCLUSION**

For the foregoing reasons, NPR's motion to dismiss is granted in part, with respect to plaintiff's retaliation claim in Count Two stemming from the Radio Bilingue incident.  NPR's motion to dismiss is otherwise denied.  The Complaint's passing references to the CBA that NPR latches on to do not mean that adjudication of plaintiff's DCHRA claims depends on the CBA or that he asserts rights under the CBA.  As such, plaintiff's claims are not preempted by § 301 of the LMRA.  NPR's argument that plaintiff's allegations, particularly of Gerringer's repeated use of the word "boy" and Herrera's ongoing failure to train or supervise him, do not make out a claim for hostile work environment under the DCHRA is similarly unpersuasive.

Accordingly, plaintiff's discrimination and hostile work environment claim in Count One and retaliation claim, based on the written warning he received following the C-Band incident and his ultimate termination, in Count Two may proceed.  An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: November 13, 2020.

_____
BERYL A. HOWELL
Chief Judge